Good morning, if it pleases the court. Good morning. I'm going to reserve five for Roberto. I think I can handle ten minutes of my opening. I think perhaps the most important thing that the judge, the court below, said in determining this appeal was in the court's first order. So are you Mr.? I apologize, I'm Mary Westrike for the appellant. The most important thing I think the court said was in the first order, the very end, when in ruling on motions to dismiss the same six claims that were in the final motion, the court only dismissed the second, third and fourth claims. And that's the final page on, it's at the excerpts of record, page 13. So even though there were comments in the order which were of general reference to the way the complaint was drafted and things like that, the actual dismissal did not occur for the first or the fifth or sixth claims. So I don't think the average attorney would think that the entire pleading was in jeopardy if the court specifies that it's only dismissing would leave to amend. So is your argument then based on the order you thought that the complaint adequately stated certain claims and so you sought to fix the claims that you thought were deficient? That's what it boils down to? Well, I wouldn't go that far because it required me, the things I had to do to the second, third and fourth claim required a more specific and to specify certain things. Let's look at the second amended complaint. Because that's the one that's on appeal right now. So you'd like us to, I take it one, find that it's adequate in terms of the claims stated. And if you fall short of that, then send it back for an opportunity to amend, I take it? Correct. Tell me what contract was breached in connection with the term sheet. Because frankly, I shared the district court's concern that the allegations really are very conclusory in nature. And it's really hard to decipher the breach of contract claims, much less the fraud claims, which require a higher level of specificity in terms of pleading the who, what, where, why, how, who made the misrepresentations, who induced him into purchasing these fake artworks, what specific statements were made. I would expect those sort of specific allegations when you're trying to assert a fraud claim. But I realized there are a lot of players here and frankly, looking through the complaint a couple of times now, I couldn't figure out some of your claims. So perhaps you can help guide us to more specific claims that if given an opportunity to do so, that you could amend in order to survive a 12B6 challenge. First, just, I'll answer your question, but I want to say the reason I mentioned those three believe that the pleading as a whole was perhaps adequate, if not perfect. And so, but I did not limit my restructuring and my changes to just those three. Now, in reference to the first claim about the Raven contract, there's not a claim in that one that that particular painting was a fake or the fraud. Well, that does, yeah, I mean, I guess, but let me just say a little further if you're going to talk about the first one. In, it's the Jackson Pollock one, but there's not a claim that it's fake. Can you explain what particular individual or individuals and what specific acts that allegedly caused Mr. Carlson what definite harm? It appears that the joint venture agreement contemplated by the term sheet never came into existence. So what writings or writings, if any, govern the party's relationships concerning that Pollock painting? I can't tell from there. First of all, the term sheet itself is binding and it says it is unless the Mr. Carlson chooses for it not to be. And by his actions. How about if we just start with a real simple question? You took 150 pages to lay all this out. Can you tell us in simple terms how your client was defrauded? Well, each one has to be looked at separately because the because the first the first claim to answer the question about that one is that he was he was defrauded because he paid a million dollars to invest in this Pollock. Their obligation with that million dollars was to use it in order to market, authenticate, prepare it for its marketability and sale. And instead, what they did was is they used 90% of it to just basically pay themselves out of their investment, cash themselves out of their own investment, and shipped it to a place in London, where it remains to this day because of unpaid bills. And so what happened was is in effect is the the million dollars that they were supposed to use to get it sold was never used for that. Had they told him, give us a million dollars and then we're all just going to give ourselves, you know, 900 some thousand dollars and he wouldn't have invested. He wasn't investing to give them cashed out of their investment. And it's it says it right in there in the in the complaint that one, they moved it without his permission to a location. And number two, they did not use the funds for the intended purpose of getting it marketable, authenticated, some work needed to be done, because sometimes these things are a little beat up by the time you're selling them. And you have to, you know, get experts to be working on them. And that costs a lot of money. So he was told that his money was going to be used to pay for the venture of getting it sold for $100 million. But not in a written agreement? Well, you had the term sheet, the term sheet specified certain things, including that it was binding unless, by the actions of Mr. Carlson not, Mr. Carlson elected to proceed on the term sheet, paid the remaining $935,000 on the contract, they provided the remaining the other attachments that were supposed to be in part of the joint venture, which verified certain things about the painting and its history and so on and so forth. So the parties proceeded on the on the basis of the term sheet. And he was not pursuant to an action by Mr. Carlson. It gave him the option, basically, whether to stay under the term sheet or to go ahead and complete the broader joint venture agreement. So the joint venture agreement was never executed. Correct. So in the complaint, the Second Amendment complaint, when it talks about the terms of the JVA, the joint venture agreement, you're talking about the term sheet. Correct. I think a term sheet can But I think that's what's confusing about it. So now looking to down at the granular level, looking at the term sheet, what provision was breached? Was it the provision that can't be moved without his consent? Yes. And how did that cause him harm? Well, because it's without his consent. It's sitting over in London right now and almost impossible to get back. And you have the further, as I said, the understanding of the pay the bills, the kind of bill that's not being paid over there in London right now, $15,000 or something like that. But he didn't give them the money just to free them of the burdens of having previously invested in this, take their money out of it and leave him as the sole person hanging with a million dollars invested in this painting. And so he was buying, it became a joint venture in the sense that he didn't buy a piece of the, he bought a percentage interest in the painting. He didn't buy like stock in Raven Art. He bought a percentage. And he's still an owner. He owns right 23 and a half percent of the painting that's sitting in London and without any money to, to, to further the, the, the venture at all, because all of his money, almost all of his money was just put in the pockets of the three. Let me ask you this, if the debts paid with respect to the painting sitting in the London were paid, then the painting would be sprung supposedly and it could be sold. Well, no, it would still have to go to other vendors who need to do things to market it, to authenticate it. A lot of these Pollocks are, it's easier to, the answer is no, that would not be immediately. They need more money than just the $15,000. They would have to spend money on other experts to make this work. Okay. Let's talk about claim six. This is the Motor Pleasure Yacht. Now, does he still own that? That was destroyed in a recent hurricane and it was totaled by the insurance company. And there was a, they could, he was never able to sell it for anywhere near the kind of price that he bought it for. But he was still an owner of it. He was the only, he was the owner of the company that owned the boat. Well, so how was he harmed by the acts of the defendant? Well, first of all, they, pretending to be an expert in, in that kind of transactions, they told him that it was worth more than it really was worth. He, the Mr. Mangan was in a hurry to get it purchased because he actually used it as soon as they bought it to take his whole family and a bunch of people on a Bahamas trip. He got him to spend another $200-some-thousand to fix it up after they got it under the pretense that the previous owners had stripped it. When in reality, it was just had some defects in it. And then he also had promised he and Mr. Force that they were going to give one third each of the investment, which they never did. So he was basically putting forward his money, Mr. Carlson, with the idea that the other two within 60 or 90 days would put in their one third. And also the understanding that he had gotten it at a reasonable price. He told them, oh, this is a bargain at any price. But at this price, it turned out that you couldn't sell it for half. Insurance company payout for the destruction of the shot? Well, maybe like less than half of the. Well, they did. Yes. And he got part of that. Well, he got, yes, he got, his company got it, but he had various debts that he had accrued over the years and maintaining it. He had to keep it in a slip, various things like that. There were overhead that, that were made it prohibitive to really keep this boat. All of the insurance payout? No, most of it went to actually to pay debts that had accumulated on the boat. Again, if you have three owners. Let me just ask you, is that a fraud claim? Your boat claim? Your yacht claim? Yeah, because they, yes, because they told him that number one, that it was worth something that it was not. And he pretended to be an expert in buying these boats. Number two, they induced him to make the purchase with a promise that they were going to kick in their one third, which would have also made them slip costs, one third of the insurance, one third of the maintenance. So he thought he was going into an arrangement in which it was all going to be shared when, in fact, that was not true. And, and Mr. Mangan took very good. I thought he was kind of a yacht aficionado or something. Mr. Carlson? Yes. Not at all. So I'm just wondering why this wasn't just a bad investment, why it was fraud? Because they. I mean, everyone knows boats are bad investments. I've lived on boats. So I have a little bit idea. I've lived on sailboats. So I have some idea what we're talking about here. I could say this, that if you tell somebody, oh, I'm very expert in this. And I can tell you that this price that we're buying it for is a bargain. When in reality, it's probably worth 20, 30% or less than what we're paying for it. But I'm in a hurry to buy it because I want to take a trip with it and, in fact, do it as soon as possible after it's purchased. So if he took a trip with it, was he the, did he, does he know how to drive these things? Or operate them? Mr. Mangan. Mr. Mangan took the trip. Yes. He pretended to be, he is probably expert. He is, he's the person who had. I couldn't operate that boat. He, he was going to operate that, right? So he had a little expertise in a yacht more than I would. Correct. And so he probably knew better. And we're saying that he knew better about what the real value of it was. You're down, just so you know, you have a minute and 42. That always happens. You want to save the rest of your time? Have, I mean, a minute 42 total? Yes. Remaining? Yes. I would like to save that so I can have a minute or two to rebut. That was. Good morning. Good morning. May it please the court. I'm Richard La Puma. I represent some of the defendants, Mr. Mangan, and also Raven Art, Inc. and Art Possible, LLC. Before we get all mired into the complaint, I just want to ask you a quick question, this, I mean, jumping to, I've got a problem with the, the attorney's fees part of it, even if that I'm wondering what in the record justifies an award of over $91,000 for 98.6 hours of work and the work that we're talking about, I think was on, wasn't it on count claim one and then somehow you're saying that works for everything? Yeah. So there's a couple of issues there. And so let me address both. Um, first of all, the first issue you're talking about is really what's in the judge's discretion. So the judge has the ability to award attorney's fees in an amount. According, usually they use. I just can't make the math work here. Well, the math doesn't work because what happened here is that there was evidence submitted. There was an affidavit from Mr. Mangan's attorneys that indicated they spent some 99.8 hours on the case. And, uh, in the trial court, Mr. White Westright pointed out that the math doesn't work there because at 99.8 hours, you're claiming $90,000 in fees. You're talking about 900 and some dollars per hour. So that clearly didn't work. That was explained, however, in the motion papers. So. You know, what bothers me here is I've never seen such a poor submission on attorney's fees. Okay. I understand you have all those experts that tell you what the, you know, the value is in that particular community that gives you an average hourly rate, but you usually, at least in modern times, you don't just say, and I spent, you know, two hours and this is the average rate and I get this number. Usually we get things that say, to document that there were two attorneys working, you know, two attorneys did this, one reviewed that, one reviewed this. So my concern may be similar to Judge Callahan is that under an abuse of discretion standard, I would have trouble figuring out whether the court abused its discretion because there's no documentation. Okay. There's no hours. There's no which attorney, there's no what they did. So fees might be subject to award, but how would we determine that they're reasonable? All right. First of all, it bothers me too. I'm an appellate lawyer. I'm coming in, not having been the trial lawyer. I take what I'm given, just like this court looks at what the record shows, but I can tell you what was in the record because all of the cases say that this judge had discretion to use his own experience and the evidence that presented, that was presented. I looked at what was in the record and I would say not much. Well, let me, let me tell you what I saw in the record and we'll see if we can get on the same page. First of all, there was an affidavit of attorney's fees. We all agree that there was some math issue with that. There was a series of correspondences between counsel that just showed that the fees that were claimed were reasonable. And then there was this report of other fees charged by other firms in the locality because under California law, we use the Lodestar method. So we want to find not the actual attorneys and amounts that were charged, but the reasonable amounts of time. And there were math problems, as you put it, doesn't that suggest that we need to send it back for redetermination? So I'm going to tell you what I saw in the record. When that was pointed out to the trial judge, there was a response file. So this affidavit was supplemented by explaining basically that yes, there were 99.8 hours that were totally billed. But some of those hours were billed by two or three different attorneys and paralegals working at the same time. And so there's overlapping billing. I don't like that either. As I said, I'm an appellate lawyer. I'm coming in. I don't like that they did that. What I did see though, and I think this is important to note, is that in that reply, the attorneys for Mr. Mangan did tell the trial court, I have itemized billings. We'd like to submit those and have you review those as well. And the judge ruled without holding a hearing. So the real question is how far does the judge's discretion go? And as you know, discretion is broad and an attorney's fees award under California law. And let me have you pivot back to the complaint because your time is going to run short. Even if there are some problems in the complaint that I shared, the district court's concern as to the conclusory nature of some of these allegations, why is amendment futile? Was this the first motion to dismiss and opportunity for correction? No. So there's several. First of all, there was an original complaint. Then there was a motion to dismiss it. Now, Mr. Westreich, to his credit, filed his amended complaint without even waiting for the ruling. So what I meant is this is his first opportunity to try to address what the district court identified with the purported deficiencies. Well, then, then after he filed that first amended complaint, it was dismissed again. That time, the trial court took pains to draw a road map. The explanation of what was deficient. And then he filed the second amended. Then he filed the second amended complaint. Because it seems to me, reading this very, very long complaint that there are allegations that certain parties, Art Possible, Art Force, induced him into buying these fraudulent pieces of art and that they had a story to go with it to induce him into, I guess, gaining his confidence, so to speak, by talking about their own expertise. And they promised him that they would provide him authentication certificates that never came. Now, that may not be specific enough to rise the level of fraud, but it seems to me that there's something there. There could be breaches of some sort. I can't quite decipher it, but tell me why. I would like to answer that in two ways. Because I'm sure, as you know, amendments should be liberally granted. So we're at the very beginning stage of the litigation here. Okay. I'd like to address that in two ways. First, I want to point out something that was in the reply brief at page three, at the very bottom, where Mr. Westreich stated that Mr. Carlson's intent here was to hold Mr. Mangan liable for things he doesn't even know about, as long as other people committed those things. Well, there's no fraud claim that doesn't have an element of intent. There's no fraud claim that doesn't have an element of knowledge of falsity, and there's no conspiracy claim that doesn't have some element of a common purpose. So just at the outset, if you look at the whole complaint overall, it's very long, it's very confusing, and these claims are not well stated. Two of you, at least, are English majors. So I know that if you read the complaint, you saw that it was very, very difficult to understand, very confusing, and very long, tediously long. But the more important question- But what we can discern from the complaint is Mr. Ray was pebbling in fake art, right? And certain individual defendants knew that and attempted to cover that up. And so there's some kind of conspiracy allegation here. Not clear who made the misrepresentations, but they certainly all joined together. It seems like this is the plaintiff's theory to gain his confidence in order to get him to make these investments. First of all, we don't get to see the facts because nothing was developed in the record, but I can tell you that Mr. Mangan had nothing to do with John Ray and whatever he did. Those other, those were other, these are all people that deal in undocumented art. So in some ways, what Mr. Carlson or Mr. Westreich was telling you was correct, that they had this plan to purchase these undocumented pieces, find the experts who could show that they are authentic, and then try to sell them Jackson Pollock paintings are worth a hundred million dollars or more. So these are investments that were speculative at the outset. Mr. Mangan was involved in Raven Art, which owned the one Pollock painting, which is not fake, we have already heard that admission. And there's two other paintings that are owned by this Art Possible LLC that aren't even mentioned in the complaint. So let's go to the Raven one. So what I get from his argument and this, as you point out, rambling complaint is that there was money invested to try to rehab the painting. And then I guess, in the hopes that you would be able to sell it. And he was defrauded into putting his money in because the other people, including Mr. Mangan, weren't going to do what they were supposed to do. But that's, you don't get the facts. Because it wasn't developed in the record, but what really happened, if I may just supplement the record. Well, no, I'm just trying to figure out whether on notice pleading, but recognizing the need for fraud specificity, whether that's enough to put everybody on notice that we know what the general gist of the... It doesn't mean that it happened. Okay. Oh, I agree. But that is what I do divine from this complaint. Well, as Judge Glenn pointed out, there is no, there is no full pleading. First of all, you have these incredibly complex mixtures of tort claims, contract claims, estoppel claims, equitable claims, and they're all mixed together, so you can't tell what's being claimed, but none of those theories is supported by a complete listing of all the elements of any one of those claims. So that's one problem. I want to talk about a couple of the cases that were cited in the briefs, because I think they're very important. They answer particularly the questions that you may have about why should we let the court have discretion to deny without leave to amend? And I think, first of all, if you start with that Miller versus Yokohama case, you get a Ninth Circuit case that's quoted all the time. It's a very quoted case that once you've given the warning and the order wasn't followed, the trial court's discretion becomes extremely broad to dismiss a case without leave to amend, and then there's three cases that I want to discuss real briefly that tell us why you should not impede the judge's discretion here. First of all is, I think, the Nevigel versus North Coast Life Insurance case, which was quoted in the briefs. I've cited it there. I'm not going to cite it here, but in that case, it was a policyholder suing insurance companies for conspiracy antitrust. It was one of these complaints that was long prolix, very confusing, and the important thing there, though, is that there's a great discussion in that case, it's a Ninth Circuit case, and there's a great discussion about whether the trial judge has to consider what other less drastic remedies may be available. For example, and one that's specific to this case is they considered whether the trial judge should have gone back and given leave to amend and told the plaintiff, you should get other counsel, you should re-amend a different way. But then at the end, the court said, no, even though the judge should explore less drastic remedies, the judge has discretion. Once they've given the warning, once they've provided the road map and that order was completely ignored, then the judge is within its rights to dismiss without leave. The second case I wanted to point out is the 226 FRD case, Jacobson versus Schwarzenegger. And that one, an attorney was removed from a criminal prosecutor's attorney list or attorney appointment list, filed an incredibly long complaint against the governor and a bunch of state officials. It was dismissed with the warning. Then he filed a 200-page complaint that was similarly confusing in prolix. And in that case, the reason I wanted to point that out is because the court there went into a great discussion about all the reasons why a judge should control his docket, should not allow these kind of pleadings to proceed. They cause all kinds of lengthy discovery disputes. They are very confusing for litigants. They put a high burden on the judges. A judge has a right to manage his docket. So there's a lot of sort of policy reasons why discretion shouldn't be limited in cases like this. But the most important case that I want you to think about is the McHenry case that we cited, McHenry versus Wren at 84 F3rd 1172. In that case, the plaintiff was arrested for handing out food and political literature in a city park, and he sued a bunch of city officials. And the important part here, and it was a similar thing where the complaint was just unintelligible. It didn't make a lot of sense, but there were really issues there. There were first amendment issues about whether this guy really should be given the right to do what he was doing. And at the end of the day, this Ninth Circuit court held that the plaintiff in that case probably did have some valid claims. He probably had valid claims, but that doesn't relieve a plaintiff of the duty to plead according to the rules. And the judge has discretion to dismiss the case without leave to amend. And that's what our judge did here. And I had planned to go through some of those warnings and just to show, but you've read, if you read the complaint and if you read the judge's order, you see that there were very specific things that had to be done. Things like don't plead multiple theories in one claim. And here, the amended, the second amended complaint comes back with some attempt to try to say this, I'm just going to plead breach of contract here. But then when you read the paragraphs, he induced me, it's fraud, it's estoppel, it's breach of fiduciary duties. They're just, the complaint just never complied with specific orders from the court and the judge had absolute discretion to do that. Now I've got 40 seconds left. I'd like to jump back to that attorney fee claim, because I want to mention here that I get that the attorney fee submission, I didn't like it. I do think the judge had discretion. So I'm going to ask you, discretion means something. So consider that when you make your ruling. If you do remand for a hearing, say on attorney's fees, I just want the court to know that in the event that the judgment is affirmed below, that these attorney's fees will include my fees because I'll be filing a motion. And we may, because of that, we may have to have a hearing on attorney's fees anyway, in my experience, those things typically are remanded back into the trial court for those hearings. But I want the court to just realize that this case is really not about the facts. It's about discretion. What does that mean? What are the judge's powers and duties to the litigants? Defendants can be victims too. So I'm going to ask you to affirm the lower rulings. Thank you. Thank you. I have a few bullet points, which I'd like to make. You have a minute and a half for your bullet points. Okay. The McHenry case doesn't, we look at 1178, 79, it says you have to look at less drastic alternatives, et cetera. I mean, that case, I don't think supports the position that he took earlier in his argument. Secondly, it's interesting. Mr. Rome, the second attorney came, he associated in after the reply was filed on this last motion and he was associated in to be the litigation counsel, so it sort of suggests where the defense counsel thought was going to happen on this motion. I think they shared my belief. We have never had a chance to amend other than the earlier, the first amendment. What are you saying? If you hire a really good lawyer, it means that they think they're going to lose? Well, I think they were expecting, you know, that there was cases going to proceed to litigation. And I would always want the best lawyers if I get to court. But after the reply, I don't even know what he did on the motion, but I'm just saying it was after the reply was filed, he associated in, in expectation. Because the judge only ruled on the second, third, and fourth in the first ruling, there was no ruling on the first, fifth, and sixth, you know, in that, in that first order. So it was really the first time on those. Furthermore, you had the intervening conviction of Mr. Ray, you know, who confessed to the fraud. We detail at pages 17 through 18 of our opening brief, exactly where in the record we do specific allegations of manganin force, justifying these Ray paintings, Mr. Carlson. And there was no judicial notice request, correct? On that. Correct. But I was describing what I could do with the leave to amend. So that's what I told the court. And I did submit the paperwork as exhibits and it's in the record. And say, and finally conspiracy, you don't have to know everything that all your partners are doing. So that's a correct statement of conspiracy. And I don't think that there's any reason. And by the way, with the Raven, if you look at page 13 of our opening brief, I detail exactly where in the complaint we specify these promises were made, and we do make the allegations in that brief and excuse me, in that complaint. So I think the record is there that, and it establishes that Mr. Carlson was put up over $2 million to these guys, a group of individuals who very cleverly maneuvered him into putting up money after money, after money for paintings that turned out to be false. And sometimes when you have so much information and so many frauds, there was 17 contracts. So you, you could almost make a separate lawsuit out of the first claim, out of the third and fourth ones out of the sixth one. And then number five, we don't talk about at all is basically a loan transaction with Mr. James, who was their so-called expert who, you know, brought Mr. Carlson in. Thank you. Okay. Thank you for your argument. The case of Carlson versus Mangan is submitted. Thank you both for coming this morning. Thank you, Your Honor.
judges: McKeown, Callahan, Nguyen